UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MATTHEW HRITZ, | CASE NO. 1:23-CV-00235-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Matthew Hritz challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 7, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me (non-document entry dated February 7, 2023), and the parties thereafter consented to my jurisdiction (ECF #7, 8). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Mr. Hritz filed for DIB on June 4, 2020, alleging a disability onset date of October 21, 2019. (Tr. 196). The claim was denied initially and on reconsideration. (Tr. 72-78, 80-87). He then requested a hearing before an Administrative Law Judge. (Tr. 105). Mr. Hritz (represented by counsel) and a vocational expert (VE) testified before the ALJ on March 2, 2022. (Tr. 35-53; 503-

1

520).[1] On March 15, 2022, the ALJ issued a written decision finding Mr. Hritz not disabled. (Tr. 15-29). The Appeals Council denied Mr. Hritz's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Hritz timely filed this action on February 7, 2021. (ECF #1).

## FACTUAL BACKGROUND

### I.    Administrative Hearing

Mr. Hritz testified in a supplemental hearing before the ALJ on March 2, 2022. (Tr. 503). He described suffering from mental health issues including depression and anxiety that worsened as he got older. (Tr. 507). These issues caused him to miss, quit, or not appear for work; he had been fired once or twice for lashing out at work. (*Id.*). He has agoraphobia and struggles to thrive due to his anxieties. (*Id.*). He will get panic and anxiety attacks when he gets ready for work or while driving. (Tr. 508). He also struggles to connect with people and finds the social aspect of work impossible. (Tr. 507-08). He struggles to leave his house because of the dark intrusive thoughts he perceives his neighbors have of him. (Tr. 508-09). He cannot go to the store by himself. (Tr. 512). Sometimes he would not leave his home for three or four weeks at a time. (*Id.*). He even found it difficult to interact with his parents, with whom he lived. (Tr. 513). He has thoughts of harming himself with no plan. (Tr. 509). He likes to read, play games on his phone

---

[1]    The administrative hearing transcript first submitted by the Commissioner was poorly transcribed and included multiple instances of [INAUDIBLE] notations, rendering it difficult to decipher. (*See* Tr. 35-53). Subsequently, the Commissioner submitted a new transcript on July 21, 2023. (ECF #14, 15). I permitted the parties to resubmit their briefing (non-document entry of August 2, 2023), which was complete on August 3, 2023 (ECF #17, 18). Relevant references herein are to the corrected administrative hearing transcript (ECF #15) or to the parties' amended briefs (ECF #17, 18), as applicable.

and computer, play soccer, and take care of his two cats. (Tr. 514). He has an erratic sleep schedule. (Tr. 515).

At the time of the hearing, he was not in therapy or seeing a psychiatrist. (*Id.*). However, he stated he had been referred to a psychiatrist, Dr. Almhana, after being diagnosed with Asperger's. (Tr. 510). He attended a couple of sessions with Dr. Almhana in September or October the previous year, but found it was not a good fit and discontinued. (*Id.*). He had also attended two or three sessions with a speech therapist. (*Id.*).

Mr. Hritz stated he had been on a generic from of Cymbalta (duloxetine) but did not find it helpful. (Tr. 510-11). But he also said that when he was on a different medication his anxiety was intolerable. (*Id.*).

The VE then testified. The ALJ presented a hypothetical individual of the same age and education as Mr. Hritz, with the same limitations described in the RFC determination. (Tr. 516-17). The VE testified such a hypothetical individual could perform Mr. Hritz's past work as a mixer but could not perform the past work of bus person/dishwasher because the interaction with coworkers would exceed the brief interaction described in the hypothetical. (*Id.*). However, the individual could perform representative jobs as a groundskeeper, machine packager, and floor technician. (Tr. 517-18). An employer would not tolerate more than eight absences in a twelve-month period or more than 10% time off-task. (Tr. 518). The VE testified that no unskilled jobs could be performed in isolation. (Tr. 518-19).

II.     **Personal and Vocational Evidence**

Mr. Hritz was born in 1993 and was 28 years old at the administrative hearing. (Tr. 27).
Mr. Hritz completed high school. (*Id*). In the past, Mr. Hritz has been employed as a mixer,
dishwasher, bus person, and fast-food cook. (Tr. 26-27).

III.    **Relevant Medical Evidence**

On December 19, 2018, Mr. Hritz submitted for a neurotransmitter production test with
Nancy Grubb, M.D. (Tr. 310). Results revealed low production levels of dopamine,
norepinephrine, epinephrine, and serotonin. (*Id.*). An adrenal hormone report from the same day
indicated low cortisol. (Tr. 313).

On March 8, 2019, a report from naturopath Tamara Macdonald, ND, LAc, indicated Mr.
Hritz was taking multiple supplements based on the neurotransmitter results. (Tr. 336). Mr. Hritz
reported he has been anxious all his life but his anxiety has now become rare, partly due to not
putting too much on his plate. (Tr. 338). He reported he was born with only one kidney; ND
Macdonald surmised this may be the cause of his lower cortisol output and adrenal fatigue. (*Id.*).
ND Macdonald recommended he continue taking supplements and consider adding SAMe for
norepinephrine/epinephrine conversion support and mood. (Tr. 338-39).

On March 6, 2020, Mr. Hritz underwent an initial therapy evaluation with Christine
Mizen, LISW. (Tr. 363). Ms. Mizen diagnosed Mr. Hritz with generalized anxiety disorder; major
depressive disorder, moderate; and an unspecified eating disorder. (Tr. 365). She assessed his
functional status as mildly impaired for work. (Tr. 369). On examination, his judgment and mood
were within normal limits and affect congruent with mood; he was alert and oriented in all
spheres; his attention was not impaired. (Tr. 370-71). He reported occupational stressors including

4

coworkers, depression, and feelings of fear and anxiety at the prospect of low-level work the rest of his life. (Tr. 374). Social stressors included feeling "housebound" by his mental health. (Tr. 377). He reported that prior treatment for his anger, anxiety, and depression using medications and counseling had worked well. (Tr. 383). He was currently on duloxetine 30 mg twice daily; he had previously used nortriptyline, trazodone, paroxetine, and buspirone. (Tr. 386). He reported feeling unmotivated in life; he looked at job opportunities daily but was unmotivated to follow through. (Tr. 388). He lived with his parents and autistic brother and reported being very close to his family. (*Id.*).

Mr. Hritz visited his primary care physician, Thomas Wagner, D.O., on March 17, 2020. (Tr. 428). Dr. Wagner diagnosed Mr. Hritz with anxiety and depression and referred him for psychological evaluation. (*Id.*). Mr. Hritz reported that his anxiety and depression had worsened, and he did not feel the Cymbalta was helping. (Tr. 429). On examination, his mood and affect were anxious, depressed, fearful, flat, humorless, and restricted. (Tr. 430).

On June 2, 2020, Mr. Hritz met with Dr. Wagner to discuss receiving disability paperwork for anxiety and depression. (Tr. 431). Dr. Wagner noted Mr. Hritz had suffered with bouts of severe depression throughout his life and had been hospitalized in the past; his anxiety and depression has affected his ability to hold steady employment. (*Id.*). On examination, his mood and affect were depressed, flat, restricted, and sad. (Tr. 433).

On June 9, 2020, Mr. Hritz met with ND Macdonald for acupuncture. (Tr. 335). Mr. Hritz reported he was angry at being put on medication that affects his brain chemistry, accepted that he will be unable to commit to a long-term job, and was in the process of applying for disability. (*Id.*).

On July 24, 2020, ND Macdonald wrote a letter noting her off-and-on treatment of Mr. Hritz's anxiety and depression since his diagnosis by his PCP in 2017. (Tr. 407). In the letter, she indicated he had a panic attack in 2017 while driving across country to Oregon; his father had to fly to him in Nebraska and drive him the rest of the way. (*Id.*). Since then, he has a fear of driving locally. (*Id.*). ND Macdonald had prescribed Mr. Hritz several supplements, including neurotransmitter support for imbalances and adrenal support for low adrenal function. (*Id.*). Mr. Hritz had chosen to continue taking Cymbalta and not take the prescribed supplements due to cost considerations. (*Id.*).

On July 6 and 22, 2021, Mr. Hritz self-submitted to psychological evaluation by John Zbornik, Ph.D. (Tr. 461-72). Dr. Zbornik observed Mr. Hritz as having limited conversational proficiency, appeared overly anxious during the examination, made little eye contact, and manifested a restricted/flat affect and body posture. (Tr. 462). His composite testing revealed a standard score of 109, indicating high average intellectual ability. (*Id.*). His Gilliam Asperger's Disorder Scale indicated an Autism Index Score of 81, indicating he exhibits the characteristics of high functioning autism and will require substantial functional support. (Tr. 464). Dr. Zbornik diagnosed Mr. Hritz with Autism Spectrum Disorder, Level 1. (Tr. 465). He recommended Mr. Hritz pursue supportive services, including social security. (Tr. 466). Dr. Zbornik also recommended Mr. Hritz continue counseling for his anxiety and that he may wish to consider working with a speech language therapist to improve his ability to comprehend complex interpersonal communication. (*Id.*).

Following referral by Dr. Zbornik, Mr. Hritz was evaluated for speech and language testing by Susan Kall, MA, LSP, on August 2 and 16, 2021. (Tr. 498). Ms. Kall diagnosed Mr. Hritz as

having a speech disturbance, falling under the category of sound production and language comprehension. (Tr. 500). She recommended Mr. Hritz receive speech therapy of 30 to 45 minutes weekly for social communication, to understand and respond to social situations. (*Id.*). His prognosis for achieving social skills was good with therapy. (*Id.*).

On September 24, 2021, Mr. Hritz attended a psychiatric evaluation with Diab Almhana, M.D. (Tr. 479-83). Dr. Almhana reviewed Mr. Hritz's psychiatric history that indicated no psychiatric hospitalization; his medications included failed Wellbutrin and trazodone, taking nortriptyline for a short period, and Cymbalta was not effective. (Tr. 479). On examination, Mr. Hritz demonstrated signs of depression and anxiety, and appeared listless and fatigued. (Tr. 480). Dr. Almhana diagnosed Mr. Hritz with persistent depressive disorder with intermittent major depressive episodes of dysthymia, and social anxiety disorder. (Tr. 481). He started Mr. Hritz on Trintellix 5 mg daily and Xanax XR 0.5 mg daily, and tapered Cymbalta. (Tr. 482).

## IV.  Medical Opinions

**State Agency Reviewers.** State agency reviewing physician Vicki Warren, Ph.D., evaluated Mr. Hritz's record at the initial level on August 19, 2020. (Tr. 74). She opined Mr. Hritz had a reduced ability to handle coworker and public contact but it was adequate to handle brief and superficial contact. (Tr. 76). Similarly, his ability to tolerate and respond appropriately to supervision was reduced but adequate to handle ordinary levels of supervision. (*Id.*). Ultimately, she found he could work a set routine where major changes are explained in advance and gradually implemented to allow him time to adjust to new expectations; his ability to handle routine stress and pressure in the workplace was reduced but adequate to handle tasks without strict time limitations or production standards. (*Id.*).

At reconsideration on January 15, 2021, state agency physician Carl Tishler, Ph.D.,
reviewed all additional information in the medical record and determined Mr. Hritz had moderate
limitations with his ability to concentrate, persist, and maintain pace. (Tr. 82-86). He otherwise
affirmed Dr. Warren's findings. (Tr. 85-86).

**Thomas Wagner, D.O.** On October 30, 2020, Dr. Wagner completed a checkbox form
indicating Mr. Hritz had marked and extreme impairments in his ability to interact with others; to
concentrate, persist, and maintain pace; and to adapt or manage himself. (Tr. 422-23). In support,
Dr. Wagner described Mr. Hritz as having anxiety and depression affecting his ability to hold a job
or stay on a career path. (Tr. 423). Dr. Wagner also noted Mr. Hritz had been hospitalized due to
the severity of his symptoms. (*Id.*). Dr. Wagner noted the same symptoms in his assessment of Mr.
Hritz's physical health on March 23, 2021. (Tr. 460).

**Carolyn Arnold, Psy.D.** On January 5, 2021, Mr. Hritz underwent psychiatric evaluation
with Dr. Arnold. (Tr. 453-58). She assessed Mr. Hritz with a mild-to-moderate impairment and
able to perform most activities of daily living. (Tr. 457). Dr. Arnold assessed Mr. Hritz with a fair
prognosis that could be improved by continuing counseling, trying other medications, and
attempting electroconvulsive therapy as suggested by his physician. (Tr. 456-57). She noted he had
intact mental flexibility and short-term and long-term memory. (Tr. 457). He could not sustain
concentration and persistence with multistep tasks and was distractible and fatigued as evidenced
by his performance on serial seven tasks. (*Id.*). He has limited social interactions and has had
difficulty with his social interactions, particularly at work or with family, due to his depression.
(*Id.*). He has no difficulty receiving supervision. (*Id.*). He had adapted to his limitations by self-
isolating, reducing activity, and sleeping a lot. (*Id.*).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process — found at 20 C.F.R. § 404.1520 — to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Hritz last met the insured status requirements for DIB on December 31, 2021; he had not engaged in substantial gainful activity between the alleged onset date of October 21, 2019, and his date last insured. (Tr. 17).

At Step Two, the ALJ found Mr. Hritz's depression, anxiety, epicondylitis of bilateral elbows, and right knee dysfunction were severe impairments. (*Id.*). The ALJ also identified that Mr. Hritz had an Autism Spectrum Disorder (ASD) diagnosis, but determined it was not a severe impairment because "there is no evidence of any autistic or neurocognitive issues mentioned by any of his treating sources elsewhere in the record." (Tr. 17-18) (citations omitted).

At Step Three, the ALJ found Mr. Hritz did not have an impairment or combination of impairments that met or medically equaled a Listing; the ALJ reviewed Listings 1.18 (dysfunction of a major joint due to any cause), 12.04 (depressive and other related disorders), and 12.06 (anxiety disorders) when reaching this conclusion. (Tr. 18-22). With respect to Listings 12.04 and 12.06, the ALJ determined Mr. Hritz had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 19-21).

At Step Four, the ALJ reviewed the medical records, function reports, administrative hearing testimony, and medical opinions (*see* Tr. 22-26) to find Mr. Hritz has

> the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), with the following nonexertional limitations. He can understand, remember, carryout, and complete simple routine tasks with no strict production rate pace requirements. He can adapt to brief and superficial interactions with

10

supervisors, coworkers, and the public, defined as no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others. He can adapt to routine workplace changes.

(Tr. 22). The ALJ found that Mr. Hritz had past relevant work as a mixer, and that he could perform this work through the date last insured. (Tr. 26). At Step Five, the ALJ found there were representative jobs in the national economy Mr. Hritz could perform, including grounds keeper, machine packager, and floor technician. (Tr. 28).

Ultimately, the ALJ found Mr. Hritz was not under a disability as defined in the Social Security Act, at any time from the alleged onset date of October 21, 2019, through the date last insured of December 31, 2021. (Tr. 29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account

11

whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not

12

mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

DISCUSSION

Mr. Hritz's appeal raises two issues: whether the ALJ improperly rejected Dr. Wagner's opinion based on his alleged noncompliance with mental health treatment, and whether the ALJ erred in rejecting his ASD diagnosis as a severe impairment at Step Two. (ECF #17, PageID 615-21). For the reasons outlined below, I find neither argument persuasive.

**I.     Substantial evidence supports the ALJ's decision that Dr. Wagner's opinion was unpersuasive.**

Mr. Hritz first argues the ALJ erred by rejecting Dr. Wagner's opinion because it appeared to side-step the formal compliance analysis required by SSA regulations. (*Id.* at PageID 615). He argues that precedent recognizes medication noncompliance often results from the mental impairment itself and therefore is not a willful excuse on a claimant's part. (*Id.* at 615-16). He states that Social Security Ruling (SSR) 82-59 requires the ALJ conduct an appropriate non-compliance analysis when rejecting a treating source opinion, which the ALJ did not do. (*Id.* at PageID 617-18).

The Commissioner counters that, viewed as a whole, the ALJ appropriately considered Dr. Wagner's opinion under the regulations and substantial evidence supports his determination. (ECF #18, PageID 631-35). The Commissioner also points out that SSR 82-59 was rescinded on October 29, 2018 and replaced by SSR 18-3p. (*Id.* at PageID 633-34). However, SSR 18-3p does not apply until after a claimant has been found disabled and therefore does not apply to Mr. Hritz. (*Id.*). Thus, the ALJ was permitted to consider other factors tending to support or contradict a medical opinion, and substantial evidence supports the ALJ's determination. (*Id.* at 634-35).

13

Initially, the Commissioner correctly notes SSR 82-59 was rescinded and replaced by SSR 18-3p on October 29, 2018. 83 Fed. Reg. 191, 49616 (Oct. 2, 2018). Furthermore, the Commissioner is correct that SSR 18-3 only applies after a finding of disability. *Id.* (stating "the individual is otherwise entitled to disability" as a condition prerequisite to "decid[ing] whether the failure to follow prescribed treatment policy may apply in an initial claim"). Because SSR 18-3p is inapplicable to this case, I turn to whether the ALJ properly considered Dr. Wagner's medical opinion according to the regulations.

Because Mr. Hritz filed his application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these revised regulations, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 404.1520c(b). The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(a). An ALJ must explain how he considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of

14

relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ did not consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Mr. Hritz does not argue the ALJ failed to consider the factors of supportability and consistency; rather, he argues the ALJ "is required to conduct an appropriate non-compliance analysis, with appropriate consideration of the role that [his] mental health impairments played in that non-compliance and to offer [him] the opportunity to explain this." (ECF #17, PageID 617-18). Mr. Hritz takes issue with the ALJ's reference to Mr. Hritz's treatment compliance as "inconsistent" and "subtherapeutic," and alleges the ALJ's conclusion was speculative at best. (ECF #17, PageID 616).

As noted above, the ALJ was not required to perform a "non-compliance analysis." Instead, the ALJ must explain the supportability and consistency of the medical opinion and consider all appropriate factors available in the record. On this issue, the ALJ stated as follows:

> I am not persuaded by Dr. Wagner's mental residual functional capacity assessment of the claimant dated October 30, 2020, because his opinion that the claimant's mental impairments have caused him marked to extreme limitations in social functioning, concentration, persistence, or maintaining pace, and adapting and managing himself are not substantiated by the claimant's inconsistent compliance with treatment since the onset date, as evidenced by his reports of ameliorative response to Cymbalta 60 mg in July 2019, which was followed by a long gap in mental health treatment between this date and July 2021, when he sought an evaluation for autism and a resumption of outpatient medical care for depression and anxiety in September 2021. Although the claimant was reportedly still taking his Cymbalta 60 mg daily, his presentation at his appointment with Dr. Wagner in February 2020, indicating abnormal mood and affect appears to be secondary to inconsistent compliance with longitudinal treatment history for the following reasons. First, his February 2020 presentation is not consistent with the claimant's

15

stable treatment with Cymbalta since 2017, and his reported improvement with the same dose in April 2019, when he saw Dr. Filiatraut. Second, his presentation in February 2020 is not consistent with his normal mental functioning during his physical therapy evaluation his normal mental assessments in January 2019 or during an emergency room visit in December 2019. Third, the claimant's comment to State Agency-requested consultative psychological examiner Dr. Arnold regarding his desire "to get mental health treatment and try new medications," indicates that he had not been compliant with mental health treatment (either in-person or virtually) in several months since his mental health treatment follow-up with Dr. Filiatraut in April 2019, when he asked about eventually reducing Cymbalta in the future, and his first documented treatment note in the record with Dr. Thomas in February 2020, through January 5, 2021, when Dr. Arnold examined him. Fourth, on September 24, 2021, the claimant met with Diab Almhana, M.D., for the first time, when he diagnosed the claimant with moderate effects from a major depressive disorder with intermittent depressive episodes and a social anxiety disorder in September 2021, for which he recommended that the claimant "start Cymbalta 30 mg twice daily," indicating the claimant's noncompliance with Cymbalta for several months. Dr. Almhana prescribed the claimant two new psychotropic medications, Trintellix on a daily basis and Xanax on an as needed basis, in September 2021, but he discontinued them a month later on October 29, 2021, replacing them with counseling services, which I find the claimant has not yet begun through the date of this decision. Accordingly, I find Dr. Wagner's mental residual functional capacity assessment from October 2020, is not persuasive because the longitudinal evidence establishes the claimant had an ameliorative response to Cymbalta 60 mg for several years, but he stopped taking his medications without any documented advice to discontinue them for several months, resulting in an apparent exacerbation of his symptoms in February 2020, when he saw Dr. Wagner, followed by several months of apparent non-compliance based on his desire to "get mental health treatment" when he spoke to Dr. Arnold in January 2021, followed by his first pharmaceutical appointment with Dr. Almhana in September 2021. In sum, although the claimant requires mental health treatment to maintain his mental stability to work, his apparent inconsistently treated effects of his mental impairments in the record suggest no more than "intermittent" exacerbations of his depressive symptoms, which would restrict him to mental work-related activities within the scope of the nonexertional mental limitations that I have set forth in this finding on a sustained, regular and continuing basis.

(Tr. 24-25).

I see no error in the ALJ's analysis of Dr. Wagner's opinion pursuant to the regulations.

An ALJ need not specifically use the words "supportability" and "consistency." *Cormany v. Kijakazi,*

No. 5:21CV933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (stating "an ALJ need not specifically use the terms 'supportability' or 'consistency' in his analysis."). However, he must make the reasons for the supportability and consistency analysis sufficiently clear for subsequent review to determine whether substantial evidence supports the claimant's disability determination. *Id.*

The ALJ did that here. He has provided a full analysis of Dr. Wagner's opinion and compared it against Dr. Wagner's own treatment history (*e.g.*, "the longitudinal evidence establishes the claimant had an ameliorative response to Cymbalta 60 mg for several years, but he stopped taking his medications without any documented advice to discontinue them for several months, resulting in an apparent exacerbation of his symptoms in February 2020, when he saw Dr. Wagner"), and intermittent treatment history from other providers and his own testimony (*e.g.*, "Dr. Almhana prescribed the claimant two new psychotropic medications, Trintellix on a daily basis and Xanax on an as needed basis, in September 2021, but he discontinued them a month later on October 29, 2021, replacing them with counseling services, which I find the claimant has not yet begun through the date of this decision."). This explanation is sufficient for me to conduct an appropriate review. The ALJ need do no more.

Because the ALJ analysis of Dr. Wagner's opinion was consistent with the regulations, I find Mr. Hritz's first argument does not warrant remand.

## II.    The ALJ properly incorporated limitations in the RFC responsive to Mr. Hritz's ASD diagnosis despite finding it not severe at Step Two.

Mr. Hritz next argues the ALJ erred by not finding Mr. Hritz's ASD diagnosis a severe impairment at Step Two. (ECF #17, PageID 618). In essence, he argues the ALJ exceeded his role and attempted to "play doctor" by substituting his judgment for that of the diagnosing physician. (*Id.* at PageID 618-21).

17

The Commissioner counters that Mr. Hritz's argument fails as a matter of law. (ECF #18, PageID 636-38). Prevailing caselaw in the Sixth Circuit holds that, if the ALJ considers all impairments, both severe and non-severe, when forming the RFC, there is no reversible error. (*Id.* at PageID 636, citing *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020)). Furthermore, beyond those outlined in the current RFC, Mr. Hritz did not identify additional limitations, supported by objective medical evidence, he needs to accommodate his ASD diagnosis. (ECF #18 at PageID 637).

At Step Two, the Commissioner must determine whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). In the Sixth Circuit, the Step Two severity regulation codified at 20 C.F.R. §§ 404.1520(c) and 404.1521 represents a *de minimis* hurdle in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). A severe impairment is one that has "more than a minimal effect" on the claimant's ability to do basic work activities. SSR 85-28, 1985 WL 56856, at *3. After an ALJ finds even one alleged impairment to be severe, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5. Therefore, even if the ALJ errs by failing to find a particular impairment severe at Step Two, the error is harmless if the ALJ considers all the individual's impairments in the remaining steps of the disability analysis. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ's finding of least one severe impairment means Mr. Hritz has cleared Step Two and therefore failure to find any other severe impairment constitutes harmless error. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987)). Whether any remaining impairments are severe is not "legally relevant"

18

given the ALJ's determination that one impairment was severe and therefore, the ALJ had to

consider all impairments in the remaining steps. *Id.*

The ALJ considered Mr. Hritz's ASD diagnosis at Step Two, but concluded it was not

severe, providing the following analysis:

> *Non-Severe Impairments – autism spectrum disorder with speech disturbance*
>
> After four-day evaluation at Kenneth DeLuca, Ph.D., & Associates in July 2021,
> examining psychologist John Zbornik, Ph.D. opined the claimant was exhibiting
> the following signs of an autism spectrum disorder: "significant difficulties in social
> interaction and nonverbal communication, alongside restricted and repetitive
> patterns of behavior and interests. It differs from other autism spectrum disorders
> by its relative preservation of linguistic and cognitive development". A severe
> impairment is a medically-determinable impairment that causes significant (i.e.,
> more than minimal) limitations in basic work-related activities for at least a twelve-
> month period during the current adjudicating period. The undersigned finds,
> based on treatment notes from his primary care physicians and Dr. DeLuca &
> Associates, the record does not document any longitudinal evidence of significant
> manifestations of the claimant's autism spectrum disorder that would meet the
> requirements of a severe impairment; in fact, there is no evidence of any autistic or
> neurocognitive issues mentioned by any of his treating sources elsewhere in the
> record. Accordingly, I find the record does not establish the claimant's recently-
> diagnosed autism spectrum disorder with speech disturbance has imposed
> limitations that would be more restricting than the longitudinal effects of
> depression and anxiety otherwise established through the date of the decision.

(Tr. 17-18). With respect to the RFC determination, the ALJ provided:

> As discussed at Step 2 of my decision, I am not persuaded by a psychological
> evaluation by claimant's own examining psychologist John Zbornik, Ph.D., from
> July 2021, to the extent the evidence fails to establish a severe autism spectrum
> disorder with manifestations that meet the durational requirement of a severe
> impairment pursuant to guidance in SSR 85-28. Although Dr. Zbornik opined the
> claimant was exhibiting signs of an autism spectrum disorder with related speech
> difficulties for which he recommended speech therapy and vocational
> rehabilitation, there is no evidence of the claimant's actual receipt of such therapy
> outside of an initial speech evaluation in August 2021. Based on a longitudinal
> review of the totality of the evidence, I do not find the claimant has exhibited
> significant speech impediments or autism spectrum disorder prior to this
> evaluation when he was treated by Dr. Filiatraut or, even Dr. Wagner, or State
> Agency-requested consultative psychological examiner Carolyn Arnold, Psy.D., on

19

January 5, 2021. Moreover, functionally, the claimant engaged in substantial gainful activity without any documented proof of special work-related accommodations in 2011, 2012, and 2013, and he engaged in consistent part-time work activities until 2019, and he was a pianist/musician until around July 2019.

(Tr. 26) (internal citations omitted).

With this, the ALJ has made clear that, even though he determined it was a non-severe impairment, he considered Mr. Hritz's ASD diagnosis when forming the RFC. The ALJ found Mr. Hritz required additional non-exertional limitations including:

He can understand, remember, carryout, and complete simple routine tasks with no strict production rate pace requirements. He can adapt to brief and superficial interactions with supervisors, coworkers, and the public, defined as no arbitration, mediation, negotiation, confrontation, or being responsible for the safety or supervision of others. He can adapt to routine workplace changes.

(Tr. 22).

Given these additional limitations, the ALJ has met the appropriate standard for this Circuit. Although the ALJ did not find Mr. Hritz's ASD diagnosis was a severe impairment at Step Two, the ALJ considered all severe and non-severe impairments throughout the decision and included appropriate accommodations within the RFC. Furthermore, I agree with the Commissioner that Mr. Hritz has not identified what, if any, additional accommodations he requires for the RFC.

Because substantial evidence supports the ALJ's RFC determination, I find Mr. Hritz's second argument does not warrant remand.

20

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I

**AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: January 8, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE